**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

NICHOLAS ROZDILSKY,

    Plaintiff,

    v.

LIQUIDITY SERVICES, INC.,

    Defendant.

Civil Action No. 22-3355-TDC

LIQUIDITY SERVICES, INC.,

    Plaintiff,

    v.

NICHOLAS ROZDILSKY,

    Defendant.

Civil Action No. 23-1653-TDC

**MEMORANDUM OPINION**

Plaintiff Nicholas Rozdilsky has filed a civil action, No. 22-3355-TDC, against his former employer, Defendant Liquidity Services, Inc. ("LSI"), in which he asserts claims of race discrimination and retaliation in relation to the termination of his employment, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17; and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't §§ 20-601–611 (LexisNexis 2021).

Separately, LSI has filed a civil action, No. 23-1653-TDC, against Rozdilsky in which it asserts claims of misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), and the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann.,

Com. Law §§ 11–1201 to 11–1209 (LexisNexis 2013), as well as a common law breach of contract claim. In that case, Rozdilsky has filed a counterclaim against LSI for retaliation in violation of § 1981.

LSI has filed a Motion for Summary Judgment as to Rozdilsky's retaliation claims in No. 22-3355-TDC and Rozdilsky's retaliation counterclaim in No. 23-1653-TDC. In turn, Rozdilsky has filed a Motion for Summary Judgment on LSI's claims in No. 23-1653-TDC. The Motions are fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, LSI's Motion will be GRANTED IN PART and DENIED IN PART, and Rozdilsky's Motion will be GRANTED.

## BACKGROUND

### I.    Alleged Retaliation

LSI, a company based in Bethesda, Maryland, operates e-commerce marketplaces for surplus and overstocked goods. In April 2018, Plaintiff Nicholas Rozdilsky, a White man, was hired as LSI's Vice President of Marketing, a role which became the Vice President and Chief Marketing Officer in November 2019. He was the highest-ranking marketing executive at LSI and reported directly to LSI's Chief Executive Officer ("CEO"), William Angrick, III. Angrick terminated Rozdilsky in August 2021.

While working at LSI, Rozdilsky regularly received favorable recognition for his work, such as positive feedback from members of the Board of Directors, performance-based bonuses, and the 2020 "RISE Founders Award," which Angrick provided to him in December 2020 for superior job performance. Joint Record ("J.R.") 189, ECF Nos. 95–101, 103–219.

2

### A.    Discrimination Complaints

According to Rozdilsky, over the course of his employment at LSI, he raised complaints to the LSI executive team and the Board of Directors ("the Board") that Angrick and other LSI employees engaged in the mistreatment of, and discrimination against, female and minority LSI employees, both systemically and in individual instances. Rozdilsky discussed these issues with Michael Lutz and Novelette Murray, both of whom served as LSI's Chief Human Resources Officer at different points in time; Chief Legal Officer Mark Shaffer; and Board member Kathy Dyer.

For example, in 2019, Rozdilsky complained to Lutz and Shaffer about the mistreatment of female employees by another LSI executive, Jim Rollo, and the sales team's "frat house" environment. J.R. 40. In February 2019, he spoke at a Board meeting about the overall cultural problems he perceived at LSI, which included the "giant frat house on the sales team under Jim Rollo." J.R. 42. After Rollo allegedly "unleashed" on a female employee on Rozdilsky's team and that employee spoke to Lutz and Shaffer about Rollo's harassment, Rollo was terminated in April 2019. *Id.* After Rollo's departure, Rozdilsky continued to voice complaints on behalf of women he perceived as mistreated at LSI, and he facilitated conversations between the Human Resources ("HR") Department and the women themselves.

In March 2021, Rozdilsky spoke to Murray about the mistreatment of women and minority employees at LSI and stated again that LSI was a "frat house," and that female employees were poorly treated because they were women. J.R. 46. In this discussion, he expressed concern over unequal treatment of female and Black employees by Angrick and others, and he told Murray that LSI could become like Papa John's, in reference to the CEO of the Papa John's pizza company

3

who "had dragged [his] company into a controversy through his racist language and conduct." J.R. 1005.

At another point, Rozdilsky told Murray that he believed that Angrick and the sales team were sabotaging an LSI employee named Shantese McBride because of her race, based on the fact that the sales team treated her worse than other people who were doing similar work, such as by canceling meetings with her and then complaining to Angrick that she was inefficient or incapable of doing her job.

Although Murray has stated that she does not recall these conversations, Rozdilsky has asserted that at various points between 2019 and 2021, Murray told him that she was going to address his concerns about the discriminatory treatment of female and minority employees at LSI, and that she would speak with Angrick about them. More specifically, he has stated that in early April 2021, Murray told him that she had spoken with Angrick about these topics, but that it was uncomfortable to do so and that she needed more help from Shaffer in order to raise these issues with the Board, given Angrick's position as CEO, Chairman of the Board, and co-founder of LSI. For his part, Angrick has denied that any LSI executive informed him that Rozdilsky had raised complaints about discrimination or hostile behavior at LSI.

Rozdilsky has also asserted that he raised such complaints directly to Angrick. One such instance occurred in early 2020, when Rozdilsky was part of a hiring committee for a marketing position and he questioned Angrick's decision to veto the hiring of Terry Hunter, "a Black candidate, very highly qualified" who was "unanimously picked" by the committee, and instead to hire a White woman. J.R. 54. After Angrick "grill[ed]" all of the committee members on why they believed that Terry Hunter was better, Rozdilsky asked Angrick, "so what's the reason you're not wanting to hire Terry Hunter?" *Id.*

4

In December 2020, Rozdilsky raised concerns with Angrick about his mistreatment of Julie Davis, LSI's Senior Director of Investor Relations, Public Relations, Corporate Communications, Content, and Seller Marketing, after a "big blowout" on a video call during which Angrick yelled at Davis and "told her what a . . . piece of crap human" she was, and that she was "worthless, deficient, and incompetent." J.R. 51, 476. Davis resigned from LSI at the end of that week. Rozdilsky spoke with Angrick a week or two after the call and told Angrick that he "didn't like the way he was treating Julie" and that he didn't understand why he was coming down so hard on her or the purpose for "laying into her." J.R. 52. Angrick did not say anything in response.

In early 2021, Rozdilsky raised concerns with Dyer about Angrick's hostile treatment of Davis, at which point Dyer stated that Angrick had told her that Davis had a lot of mental health problems.   According to Rozdilsky, Angrick spoke about Davis's purported mental health problems with many other LSI employees, including with members of the executive team and with junior employees on the marketing team during a conference call.  Rozdilsky eventually spoke to Angrick about his comments about Davis's mental health and said something to the effect of "why would you have to talk about her mental health?" J.R. 55.

On another issue, between December 2020 and March 2021, Rozdilsky raised objections to Angrick's demands that LSI stop online advertising on the website of Al Jazeera, a media outlet. Specifically, in December 2020, Angrick, Rozdilsky, and two other LSI employees received an email from the Florida Family Association ("FFA") with the subject line "Terror linked Al [J]azeera supported by allsurplus.com advertising dollars," referring to a website affiliated with LSI. J.R. 183. Rozdilsky understood the FFA to be a hate group. In response to the email, Angrick instructed Rozdilsky to take the advertisements down, at which point Rozdilsky told Angrick that Shaffer would take care of it. According to Rozdilsky, Shaffer told him not to put anything about

the Al Jazeera incident in an email because it looked like Angrick was "supporting a hate group and it looks kind of racist." J.R. 56–57.

In March 2021, the FFA sent a second email about another LSI company advertising with Al Jazeera, at which point Angrick called Rozdilsky and "went crazy." J.R. 58. When Rozdilsky tried to explain to Angrick that Shaffer thought FFA was a hate group, Angrick told Rozdilsky, "I don't give a shit what he says. I'm the principal, CEO, chairman of this company. I don't support those people on that side of the world, those religions, I don't want anything to do with those Muslim sites. Take all the advertising down." *Id.* Rozdilsky told Angrick he objected to selecting LSI's advertising based on political preference or ethnicity, but Angrick told him, "[J]ust do what I say." *Id.* Rozdilsky has asserted that after this conversation, he told Murray that "there's a major problem with Mr. Angrick and something's got to get done." J.R. 47. Although Murray has stated that she does not recall this conversation, on March 19, 2021 Rozdilsky sent a text message to a colleague in which he stated, "I told [Murray] abt Bill supporting hate group guy and demanding us taking down advertising on 'terrorist' related sites and she was like ohhh noo that's not good." J.R. 188.

Angrick has stated that he does not recall whether LSI advertised on Al Jazeera's website, whether LSI received an email from the FFA, or whether he called Al Jazeera a terrorist website. Rather, when asked about the incident, he questioned why LSI would be spending money marketing with a Middle Eastern news outlet since LSI is largely based in North America.

### B.    Termination

On August 13, 2021, Rozdilsky attended a video meeting with Angrick and Murray in which Angrick told Rozdilsky that LSI was terminating him. According to Rozdilsky, Angrick told him that he appreciated his service but that Angrick was moving in a new direction, mentioned

6

several times that he would give Rozdilsky a great recommendation, and did not tell him that his termination was related to his job performance. In its Form 8-K filing with the United States Securities and Exchange Commission reporting on Rozdilsky's departure, LSI stated that Rozdilsky was terminated without cause due to a new organizational structure in which the Chief Marketing Officer position was eliminated.

In his deposition, Angrick testified that he made the decision to terminate Rozdilsky sometime between April and July 2021, but in a declaration he stated that he "made the decision to end the employment of Nicholas Rozdilsky in August 2021." J.R. 119. Angrick stated that he made this decision based on "an accumulation of data points" from "members of the leadership team" and the "directors," including reports that Rozdilsky was not responsive and could not be contacted. J.R. 457. Specifically, Angrick asserted that in 2021, there were a series of workshops between LSI executives and Board members, and that after Rozdilsky's performance at those workshops, he, "the leadership team," and the Board determined that LSI "needed to make a change." *Id.* According to Angrick, many of the questions asked of Rozdilsky at the workshops "were met with vacant stares," and "[o]ften the answer would come from a subordinate or would be someone else trying to step in in the absence of our chief marketing officer trying to lead the discussion," which led him to conclude that LSI was not "getting the type of leadership" and "the strategic direction" it needed from Rozdilsky. *Id.* Angrick has also stated in a declaration that at the time that he decided to terminate Rozdilsky, "nobody . . . told me that Mr. Rozdilsky had made any complaint, raised any concern, or had any conversation about alleged discriminatory, retaliatory, hostile, or unlawful behavior in the workplace," such that "those complaints, concerns, or conversations played no role in my decision to end his employment at LSI." J.R. 119–20.

7

According to Rozdilsky, however, the LSI Marketing Department ("Marketing") was doing well up until his termination, and he had not received any negative feedback about his work. For example, a May 2021 presentation to the Board shows that, year over year, auction registrations were up 62 percent, traffic to LSI websites was up 27 percent, and mobile traffic was up 9 percent.

In the year leading up to his termination, Rozdilsky had received positive feedback from Board members, such as when in a December 2020 email about marketing materials he had sent for a Board meeting, Dyer called his content "terrific" and noted that it included "new levels of insights and new levels of performance by your team." J.R. 180. Similarly, in a July 15, 2021 email exchange in which Rozdilsky informed Dyer about a branding change, Dyer told Rozdilsky, "You guys are on fire!" J.R. 185. Then, at an August 2021 Board dinner shortly before Rozdilsky's termination, Dyer and Board member Ed Kolodzieski stated that they were appreciative of how well Marketing was performing and thanked Rozdilsky for giving up part of its budget to help the Information Technology Department. At that same dinner, Rozdilsky received praise from the Board and the executive team for Marketing's success and for being a "collaborative team player." J.R. 1004. At no point prior to his termination did Rozdilsky hear anyone at LSI express substantial concerns about his job performance, especially concerns rising to the level of possible termination.

Periodically, LSI conducted a "Board of Directors Talent Review" in which it assessed the skills of the members of its executive team. J.R. 522, 569. Angrick made the decisions on how to rate the executives. In his February 2020 Talent Review, Rozdilsky had an overall average rating of "Medium-High," which was lower than the "High" rating of two other executives, the same as the rating for one other executive, and higher than the "Medium" rating received by one executive,

8

Chief Financial Officer Jorge Celaya.  J.R. 568.  In the specific categories, Rozdilsky was evaluated as follows:  Growth Orientation: High; Leadership Qualities: Medium-High; Talent Development: Medium; Ecommerce/Digital Management: High; Buyer Acquisition & Cultivation: High; Internal Service Provision: Medium; and Operational Execution: Medium. "High" signifies that the executive was "Outstanding" in the category; "Medium" signifies that that the executive was "Competent," and "Low" signifies that the executive "Needs Development."  *Id.*

In his May 2021 Talent Review, Rozdilsky received a "Medium" overall rating, the same as that of Celaya, and lower than the "High" ratings given to the other three executives.  J.R. 571. His ratings in specific categories were:  Growth Orientation: Medium; Leadership Qualities: Low-Medium; Talent Development: Medium; Ecommerce/Digital Management: High; Buyer Acquisition & Cultivation: Medium; Internal Service Provision: Medium; and Operational Execution: Medium.

## II.    Alleged Breach of Contract and Misappropriation of Trade Secrets

### A.    Confidentiality Agreement

On April 23, 2018, around the time of his hiring, Rozdilsky signed LSI's "Employee Agreement Regarding Confidentiality, Intellectual Property, and Competitive Activities" ("the Confidentiality Agreement"), which imposed restrictions on Rozdilsky's acquisition and use of confidential LSI information.  J.R. 102. As relevant here, the Confidentiality Agreement defined "confidential information" as including:

> 1.1.2 **Marketing Plans and Customer Lists.** All information not generally known to the public that pertains to Company's marketing plans and strategies; forecasts and projections; marketing practices, procedures and policies; financial data; discounts; margins; costs; credit terms; pricing practices, procedures and policies; goals and objectives; quoting practices, procedures and policies; and customer data including customer lists, contracts, representatives, requirements and needs,

9

specifications, data provided by or about prospective existing or past customers and contract terms applicable to such customers, and the physical embodiments of such information . . . .

1.1.3 **Business Procedures**. All information concerning or relating to the way the Company conducts its business which is not generally known to the public (such as internal business procedures, controls, plans, licensing techniques and practices, supplier, subcontractor and prime contractor names and contracts and other vendor information, computer system passwords and other computer security controls, financial information, distributor information, information supplied by clients and customers of the Company and employee data) and the physical embodiments of such information . . . .

***

1.1.5 **Information Not Generally Known**. Any information related to the Company or the Company's industry or trade areas in addition to the foregoing which is not generally known to the public or within the industry or trade areas in which the Company competes that gives the Company any advantage over its competitors, and the physical embodiments of such information in any tangible form, whether written or machine-readable in nature.

J.R. 102–103. The restrictions imposed on Rozdilsky by the Confidentiality Agreement included:

1.3.1 **Non-Disclosure**. During and after my employment with the Company, I will not use, disclose or transfer any Confidential Information other than as authorized by the Company within the scope of my duties with the Company, and will not use in any way other than in the Company's business any Confidential Information, including information or material received by the Company from others and intended by the Company to be kept in confidence by its recipients . . . .

***

1.3.3 **Removal of Material**. I will not remove any Confidential Information from the Company's premises or make copies of such materials except for use in the Company's business.

1.3.4 **Return All Materials**. I will return to the Company all Confidential Information, materials and copies of the foregoing at any time upon the request of the Company, in any event and without such request, prior to the termination of my employment by the Company. I agree not to retain any copies of any Confidential Information materials after my termination of employment for any reason upon termination of my employment for any reason. . . .

1.3.5 **Computer Security**. During my employment with the Company, I agree only to use the Company computer resources (both on and off the Company's premises) for which I have been granted access and then only to the extent

10

authorized. I agree to comply with the Company's policies and procedures concerning computer security.

J.R. 104. Finally, the Confidentiality Agreement contained certain relevant limitations:

> 4.4 **Limitations.** Notwithstanding any other provisions of the Agreement, the following limitations apply.
>
> 4.4.1 **Defend Trade Secrets Act of 2016.** I may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) is made solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Further, I understand that any person who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if that person: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.
>
> 4.4.2 **Government Investigation.** I understand that no provision of this Agreement shall be construed or interpreted to limit, restrict, or preclude either the Company or me from cooperating with any governmental agency in the performance of its investigatory or other lawful duties, including providing documents or other information to a government agency without notice to the Company.

J.R. 107–08.

### B.    Retention of LSI Documents

Shortly after his termination on August 13, 2021, Rozdilsky was informed that he would be replaced by Anthony Long, a Black man who worked in Marketing under Rozdilsky as the Director of Search Engine Optimization/Search Engine Marketing. Rozdilsky asserts that at that point, he believed that his termination may have been motivated by race discrimination, so he decided that he needed to collect evidence in support of a discrimination claim. Accordingly, before he returned his LSI laptop computer to the company, Rozdilsky used his cell phone to take and retain photographs and videos of approximately 480 pages of LSI documents stored on the computer. The documents photographed and retained by Rozdilsky included emails and other electronic files relevant to his complaints about discrimination, including records relating to LSI's

11

diversity and "Environmental Social Governance" ("ESG") activities, J.R. 1007, and emails about the Al Jazeera incident. They also included records relating to his job performance and that of Marketing, including documentation of Rozdilsky's 2020 compensation and bonus, his receipt of the RISE Award, Board members' expressions of satisfaction with Rozdilsky's work or LSI's performance, and slide decks and other records reflecting Marketing's budget and positive performance by Marketing. Other records related to LSI's business performance more generally, including records showing "LSI's profitability in relation to its different market segments and services"; "LSI's merger and acquisition targets"; "[e]xecutive summaries containing segment level AEBITDA (Adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization)"; "flash reports disclosing actual profits and interim forecast profits"; and "LSI's short- and long-term initiatives by business units." J.R. 151–52. Rozdilsky also copied LSI litigation reports. On August 30, 2021, Rozdilsky mailed his laptop back to LSI.

Rozdilsky has asserted that his purpose in taking these photographs and videos was to preserve evidence "relevant to investigating my potential legal claims against LSI," such as evidence that related to LSI's diversity efforts, his job performance, Marketing's performance, and LSI's financial performance, and to provide the evidence to an attorney. J.R. 1007. According to Rozdilsky, he did not copy the entirety of the contents of the laptop computer and instead tried to be "methodical" in copying only information that was relevant to potential discrimination and retaliation claims, including evidence of his strong performance as the head of Marketing. J.R. 21. Rozdilsky retained an attorney in relation to his discrimination and retaliation claims within a month after his termination.

On October 22, 2021, Rozdilsky filed a Charge of Discrimination ("the EEOC Charge") with the United States Equal Employment Opportunity Commission ("EEOC") in which he

12

alleged race and age discrimination and retaliation in relation to his termination by LSI. On January 3, 2022, Rozdilsky, working with his attorney, signed a declaration in the case of *Lutz v. Liquidity Services, Inc.*, No. 21-1229-PWG (D. Md.), an employment discrimination case filed in the United States District Court for the District of Maryland by Michael Lutz, the former Chief Human Resources Officer of LSI. In the declaration, Rozdilsky referenced some LSI Board meeting agendas and emails that he had copied from his LSI laptop computer. On January 13, 2022, Rozdilsky was deposed as a witness in the *Lutz* case and acknowledged that he had taken the photographs and videos of material on his LSI laptop computer, and that he was keeping such information confidential to give to his attorney.

On February 16, 2022, in response to an inquiry from LSI's counsel, Rozdilsky's attorney, Susan Huhta of Outten & Golden, stated in a letter that Rozdilsky had copied the material that he believed to be relevant to discrimination and retaliation claims, had not provided the materials from the LSI laptop computer to anyone other than his counsel, agreed to make copies of the materials available to LSI, and committed that the materials would not be disclosed to any third party except in response to a subpoena or court order. On March 31, 2022, Rozdilsky's counsel submitted a written statement to the EEOC in relation to Rozdilsky's EEOC Charge that included as exhibits certain materials copied from the LSI laptop computer. Between February and May 2022, counsel for Rozdilsky and LSI engaged in a series of communications regarding Rozdilsky's photographs and videos, in which Rozdilsky's counsel declined to agree to a forensic examination of Rozdilsky's personal electronic devices, agreed to produce copies of some but not all of the notes Rozdilsky took in relation to the copied material, and reiterated that the materials would not be disclosed to any third parties. There is no evidence that Rozdilsky gave the photographs or videos to anyone outside LSI other than his attorney or the EEOC.

## III.    Procedural History

On July 21, 2022, LSI filed a Complaint in the United States District Court for the District of Columbia in which it alleged the following claims against Rozdilsky relating to the copying and retention of materials from his LSI laptop computer in the following numbered counts:  (1) breach of contract; (2) a violation of the MUTSA; and (3) a violation of the DTSA.

On December 28, 2022, Rozdilsky filed in the United States District Court for the District of Maryland the Complaint in No. 22-3355-TDC in which he alleged the following claims against LSI in the following numbered counts:  (1) race discrimination arising from his termination by LSI, in violation of § 1981, Title VII, and the MFEPA; (2) age discrimination arising from his termination, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634, and the MFEPA; and (3) unlawful retaliation, in violation of § 1981, Title VII, and the MFEPA.  On April 26, 2023, Rozdilsky filed an Amended Complaint but maintained the same counts.

On June 15, 2023, LSI's case filed in the District of Columbia was transferred to the District of Maryland and is now assigned No. 23-1653-TDC. On December 4, 2023, LSI filed an Amended Complaint but maintained the same three counts against Rozdilsky. On March 18, 2024, the Court granted Rozdilsky's Motion to Consolidate and thus consolidated the two cases for discovery. After the Court denied Motions to Dismiss in both cases, the parties filed Answers to the pending Amended Complaints.  On April 25, 2024, Rozdilsky filed with his Answer to LSI's Amended Complaint in No. 23-1653-TDC a Counterclaim against LSI in which he alleges that the filing of that case constituted unlawful retaliation for his filing of discrimination and retaliation claims with the EEOC and for participating in Lutz's employment discrimination case against LSI, in violation

14

of § 1981. On May 19, 2025, the Court granted Rozdilsky's voluntary dismissal with prejudice of the age discrimination claims in Count 2 of No. 22-3355-TDC.

## DISCUSSION

After the completion of discovery, LSI filed its Motion for Summary Judgment in which it seeks summary judgment only as to Rozdilsky's retaliation claims in No. 22-3355-TDC and as to Rozdilsky's retaliation counterclaim in No. 23-1653-TDC. Rozdilsky, for his part, has filed a Motion for Summary Judgment on all claims in No. 23-1653-TDC.

### I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

### II.    LSI's Motion:  Retaliation (No. 22-3355-TDC)

The Court first addresses LSI's argument in its Motion that it is entitled to summary judgment on Rozdilsky's retaliation claims in No. 22-3355-TDC. Specifically, LSI argues that the evidence is insufficient to demonstrate that Rozdilsky engaged in protected activity or that there

was a causal connection between any protected activity and his termination, in part because the evidence conclusively demonstrates that Angrick, who made the termination decision, was not aware of any protected activity prior to that decision.

Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. Employment practices made unlawful by Title VII are those that discriminate against employees on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2 (delineating unlawful employment practices under Title VII). Because the MFEPA is the state law counterpart to Title VII and courts typically apply Title VII analysis to MFEPA claims, the Court will address the Title VII and MFEPA claims together under the federal standards. *See Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 788 (D. Md. 2013) (citing *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 743 n.8 (Md. 2007)). Claims for retaliation for complaining about employment discrimination are also cognizable under § 1981. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445, 454–55 (2008) (finding that § 1981 encompasses claims of retaliation for complaining about employment discrimination).

A plaintiff may prove a retaliation claim through either direct evidence or the burden-shifting framework of *McDonnell Douglas Corp. v. Green.*, 411 U.S. 792 (1973). *See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). Under the burden-shifting framework, a plaintiff must establish a *prima facie* case that (1) the plaintiff engaged in a protected activity, such as filing a complaint of employment discrimination; (2) the employer took a materially adverse action against the plaintiff; and (3) "the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (quoting *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). If a *prima facie* case is established, the burden

16

shifts to the employer to show that the adverse action was taken for a legitimate non-retaliatory reason. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). If the employer makes this showing, the burden shifts to the plaintiff once again to demonstrate that the employer's purported non-retaliatory reason was a pretext for retaliation. *Id.* This same burden-shifting framework applies to § 1981 and MFEPA retaliation claims. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (§ 1981); *Barreto v. SGT, Inc.*, 826 F. App'x 267, 271 (4th Cir. 2020) (MFEPA).

Here, there is no dispute that Rozdilsky was subjected to a materially adverse action when he was terminated. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (finding that termination is an adverse action for a retaliation claim). Thus, the remaining issues are whether Rozdilsky engaged in protected activity and whether that protected activity was causally connected to Rozdilsky's termination.

### A.    Protected Activity

Protected activity consists of actions taken (1) to oppose a practice forbidden by Title VII; or (2) to participate in a Title VII investigation or proceeding. *See* 42 U.S.C. 2000e-3(a); *Cosby v. South Carolina Prob., Parole & Pardon Servs.*, 93 F.4th 707, 718 (4th Cir. 2024). Courts take an "expansive view" of what constitutes protected activity. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). It includes the filing of a formal complaint of discrimination with the EEOC. *See Okoli*, 648 F.3d at 223 (stating that protected activity includes "filing a complaint with the EEOC" (quoting *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997))). Protected activity also "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin*, 149 F.3d at 259. To qualify as protected activity, the employment practice

17

opposed must be either "actually unlawful under Title VII" or reasonably believed by the employee to be unlawful. *Boyer-Liberto*, 786 F.3d at 282 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)). However, to qualify as protected activity, an employee's complaints must still communicate "a belief that the employer has engaged in . . . a form of employment discrimination" based on a protected class. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009).

Rozdilsky has asserted that he engaged in protected activity by complaining on multiple occasions about race or sex discrimination against LSI employees to Angrick and other LSI executives. In seeking summary judgment on Rozdilsky's retaliation claims, LSI first argues that none of the identified conversations that Rozdilsky had with Angrick constitute protected activity. These conversations at issue include: Rozdilsky's objections in early 2020 to Angrick's decision not to hire Terry Hunter, a Black candidate for a position at LSI; Rozdilsky's defense of Julie Davis in December 2020 after her video call with Angrick and Angrick's comments about her mental health; and Rozdilsky verbal disagreement with Angrick's decision to remove LSI advertising from Al-Jazeera, which occurred between December 2020 and March 2021.

Here, the conversations between Rozdilsky and Angrick regarding Al Jazeera do not constitute protected activity because in complaining about the alleged discriminatory reasons for the decision to cease LSI's advertising with Al Jazeera, Rozdilsky could not reasonably be deemed to be opposing employment discrimination. "Title VII is not a general bad acts statute, . . . and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII." *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011). That scope, as relevant here, covers only discrimination against an "individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

18

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Accordingly, a reasonable person could not conclude that Rozdilsky's complaints about Angrick's decision to cease advertising with Al Jazeera related to an ongoing Title VII violation. *See Cosby*, 93 F.4th at 719. For different reasons, Rozdilsky's statements to Angrick about Terry Hunter and Julie Davis do not constitute protected activity because although Rozdilsky apparently believed that Angrick's decision not to hire Hunter was motivated by race discrimination, and that Angrick's verbal attacks on Davis were motivated by sex discrimination, Rozdilsky has identified no instance in which he directly or indirectly told Angrick that he believed Angrick's actions in these instances were discriminatory.

However, viewing the facts in the light most favorable to Rozdilsky as is required at this stage, the Court finds that Rozdilsky engaged in protected activity by complaining about race and sex discrimination to senior LSI officials on multiple occasions between 2019 and 2021. In particular, Rozdilsky has testified in his deposition that in approximately March 2021, he told Chief Human Resources Officer Novelette Murray that LSI, particularly the sales team, was like a "frat house" and that female employees were being mistreated because they were women. J.R. 46. According to Rozdilsky, women were treated poorly and differently from men in that "if women would screw up," management would "just get rid of them." *Id.* Such a report to senior management of discriminatory treatment of female employees qualifies as protected activity under Title VII. *See DeMasters*, 796 F.3d at 418–20 (finding Title VII protected activity where the plaintiff relayed an employee's complaint of sexual harassment to HR and later told HR that he believed that the company was mishandling the matter).

19

### B.   Causation

LSI also asserts that the evidence is not sufficient to show a causal connection between the protected activity and Rozdilsky's termination.  A plaintiff can demonstrate that a protected activity caused a materially adverse action by either (1) establishing that the adverse act bears sufficient temporal proximity to the protected activity; or (2) establishing the existence of facts that suggest that "the adverse action occurred because of the protected activity." *See Roberts*, 998 F.3d at 123 (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)).  Further, to demonstrate causation, a plaintiff ordinarily must show that the individual who made the decision to take the allegedly retaliatory adverse action against the plaintiff was aware of the protected activity at the time that action occurred. *See Roberts*, 998 F.3d at 124.  At the summary judgment stage, this requires a plaintiff to present evidence, either direct or circumstantial, sufficient to create at least a genuine issue of material fact as to whether the decisionmaker had such knowledge. *Id.* at 125.

LSI argues that causation cannot be established for two reasons.  First, LSI argues that causation cannot be established because there is no evidence that Rozdilsky's complaint to Murray of sex discrimination against female employees was conveyed to Angrick before he decided to terminate Rozdilsky.  Angrick has denied having any such knowledge, and Murray has stated in her deposition that she has no recollection of Rozdilsky making such complaints to her. Rozdilsky, however, has specifically testified that he made these complaints to Murray, that Murray told him that she was going to speak with Angrick about these issues, and that in early April 2021, "she told me she had spoken with Mr. Angrick about these topics but doing so was very uncomfortable." J.R. 1005. Where Murray was a senior executive at LSI, and she stated that she intended to speak to Angrick about the alleged discrimination identified by Rozdilsky, he has presented evidence

20

that would likely be admissible at trial that creates a genuine issue of material fact as to whether Angrick was aware of Rozdilsky's complaints about discrimination before he decided to terminate Rozdilsky. *See* Fed. R. Evid. 801(d)(2)(D) (providing that statements of an agent or employee of a party-opponent made within the scope of the agent or employee relationship are not hearsay); Fed. R. Evid. 803(3) (providing that statements of then-existing state of mind such as intent are admissible).

Second, LSI argues that even if Angrick was aware of the protected activity, the five-month gap between Rozdilsky's last alleged protected activity in March 2021 and his termination in August 2021 is insufficiently close to support an inference of causation. When relying on temporal proximity alone, a lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation is generally too long to establish a causal connection. *See Roberts*, 998 F.3d at 127. However, intervening events "that suggest that the adverse action occurred because of the protected activity" can "bridge what would otherwise be a prohibitively long temporal gap." *See Barbour v. Garland*, 105 F.4th 579, 593 (4th Cir. 2024) (citations omitted).

Here, the evidence includes deposition testimony by Angrick in which he stated that he decided to terminate Rozdilsky "in the April to July time frame" in 2021. J.R. 457. Viewing the evidence in the light most favorable to Rozdilsky, a reasonable factfinder could conclude that the decision was made within one to two months after Rozdilsky's protected activity in March 2021. More importantly, Rozdilsky does not rely on temporal proximity only and instead cites other evidence that could support an inference that his termination was causally linked to the protected activity, including evidence of inconsistent stated reasons for his termination and of disparate treatment of Rozdilsky as compared to a similarly situated LSI employee, Chief Financial Officer

21

Jorge Celaya. First, although at the time of the termination, Angrick told Rozdilsky that he was "moving in a new direction" and that he would give Rozdilsky "a great recommendation," J.R. 8, and LSI reported in its Form 8-K filing that the termination was not for cause and was due to a new organizational structure in which Rozdilsky's position was eliminated, Angrick now asserts that he terminated Rozdilsky because of poor performance, including because Board members and senior executives were dissatisfied with Rozdilsky's work. Rozdilsky, however, has submitted evidence that during his time at LSI, Rozdilsky received positive feedback on his job performance from multiple Board members between December 2020 and August 2021, including in emails from Dyer in December 2020 and July 2021. He also received a 2020 bonus of approximately 56 percent of his salary, which was above the projected target bonus of 50 percent, and received the RISE award from Angrick in December 2020. Further, Rozdilsky has provided evidence consisting of the Board Talent Reviews showing that in February 2020 and May 2021, he received evaluations that were overall more favorable than those received by Celaya, who did not engage in protected activity, but only Rozdilsky was terminated. Where Rozdilsky has submitted evidence from which an inference of causation could be drawn, the temporal gap between the protected activity and his termination does not preclude a finding of causation. *See Barbour*, 105 F.4th at 595–96 (citing as evidence of the defendant's retaliatory animus in not selecting the plaintiff for a job the defendant's inconsistent proffered reasons for the non-selection and comparator evidence showing that other unsuccessful applicants had engaged in far more serious misconduct than the plaintiff). Accordingly, the Court finds that Rozdilsky has provided sufficient evidence on the causation element.

Based on this same evidence, the Court finds that to the extent that LSI has provided evidence of a legitimate non-retaliatory reason for Rozdilsky's termination—as asserted by

Angrick, Rozdilsky's poor performance—Rozdilsky has provided sufficient evidence of his positive performance, both generally and in relation to a similarly situated comparator who did not engage in protected activity, to establish a genuine issue of material fact on whether LSI's stated reason for Rozdilsky's termination is pretextual, and that the true reason is unlawful retaliation. The Court will therefore deny LSI's Motion for Summary Judgment as to Rozdilsky's retaliation claims in No. 22-3355-TDC.

### III.    Rozdilsky's Motion (No. 23-1653-TDC)

In his Motion for Summary Judgment, Rozdilsky argues that he is entitled to summary judgment on all of LSI's claims in No. 23-1653-TDC consisting of (1) LSI's claims for misappropriation of trade secrets under the DTSA and the MUTSA; and (2) the breach of contract claim relating to the Confidentiality Agreement.

#### A.    Misappropriation of Trade Secrets

In Counts 2 and 3 of No. 23-1653-TDC, LSI alleges claims of misappropriation of trade secrets under MUTSA and DTSA, respectively.   Rozdilsky argues that he should be granted summary judgment on both claims because (1) much of the information at issue does not qualify as a trade secret; and (2) his actions of copying and disclosing material on his assigned LSI laptop computer are covered by the DTSA immunity provision, such that liability under either statute is precluded.

#### 1.    Legal Standards

The DTSA permits an "owner of a trade secret that is misappropriated" to "bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."   18 U.S.C. § 1836(b)(1).

23

Under the DTSA:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  As relevant here, the DTSA defines misappropriation as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who . . . (i) used improper means to acquire knowledge of the trade secret[.]

18 U.S.C. § 1839(5).

Under the MUTSA, "a complainant is entitled to recover damages for misappropriation" of a trade secret, and "[a]ctual or threatened misappropriation may be enjoined."  Md. Code Ann., Com. Law §§ 11–1202(a), 11–1203(a).  The MUTSA defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 11–1201(e).  As relevant here, the MUTSA defines misappropriation as:

24

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who . . . [u]sed improper means to acquire knowledge of the trade secret.

*Id.* § 11–1201(c). Because misappropriation is defined in substantially the same way under the DTSA and the MUTSA, courts typically analyze misappropriation claims under those statutes together. *See, e.g.*, *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 435–36 (D. Md. 2024) (noting that the "definitions of misappropriation in federal and state law also mirror each other" and then analyzing a misappropriation claim under the DTSA and MUTSA together); *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 132–34 (D. Md. 2020) (noting that "Maryland defines misappropriation in 'substantially the same manner'" as the DTSA and then analyzing a misappropriation claim under the DTSA and MUTSA together (citation omitted)).

### 2.    Trade Secrets

Rozdilsky first argues that summary judgment on LSI's DTSA and MUTSA claims is warranted because much of the information he copied from his LSI laptop computer does not meet the definition of a trade secret under either statute, including because LSI failed to use reasonable measures of secrecy to protect the information at issue, and much of the information does not derive independent economic value from its secrecy.

Upon consideration of the record evidence, the Court finds that there are genuine disputes of material fact on this issue. Although many of the documents copied and retained Rozdilsky likely do not contain trade secrets for purposes of the relevant statutes, some arguably could be deemed to qualify under the applicable definitions. Indeed, Rozdilsky appears to concede as much by arguing only that "much of the information retained by Rozdilsky" does not qualify as a trade secret. Rozdilsky Mot. at 21, ECF No. 101. As one example, Rozdilsky took photographs of a

confidential LSI document entitled "Valuation Database" which, according to LSI, lists potential LSI merger and acquisition targets and which included information about whether LSI viewed each company as a competitor and ratings of those companies. J.R. 639–41. Such information could arguably be considered a trade secret under both the DTSA and the MUTSA because there may be independent economic value from this information not being publicly known or readily ascertainable by proper means. *See* 18 U.S.C. § 1839(3). Thus, regardless of whether certain documents photographed by Rozdilsky do not contain trade secrets, the Court cannot grant summary judgment on the DTSA and MUTSA claims based on the lack of any trade secrets within the relevant documents.

As for whether LSI took "reasonable measures to keep [the] information secret," 18 U.S.C. § 1839(3), LSI points to its requirement that employees with access to the information sign the Confidentiality Agreement, and the facts that it restricted access to personnel with elevated administrative rights, required users to enter an email and password to access the files, and shared information with Board members using a secure software called Board Vantage, which was also email and password protected. At a minimum, such measures create a genuine issue of material fact on whether LSI took reasonable measures to keep the information secret. *See Brightview Grp.*, 441 F. Supp. 3d at 130 (finding that a company that had a confidentiality policy in its handbook and restricted access to the disputed trade secret to a small percentage of employees would likely succeed in showing that it took reasonable measures to keep such information secret for purposes of the DTSA and MUTSA). The Court therefore will not grant summary judgment to Rozdilsky on the grounds that LSI has failed to provide sufficient evidence that Rozdilsky copied and disclosed material that meets the definition of a trade secret.

### 3. Immunity Provision

Rozdilsky also argues that he is entitled to summary judgment because the evidence undisputedly establishes that his actions fall within an exception to the DTSA that provides that:

> An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—
>
> (A) is made . . . (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law[.]

18 U.S.C. § 1833(b). On its face, if the terms of this provision apply, it bars liability under both the federal DTSA and a state trade secret law such as the MUTSA. *See id.*

Rozdilsky argues that the Court should find that the immunity provision applies because the record evidence definitively establishes that his only disclosure of any trade secrets was to his attorney, and his sole purpose in taking and retaining the photographs was to investigate or report LSI's suspected violation of anti-discrimination laws when it terminated him. At the time of the relevant events, his attorney stated in the February 16, 2022 letter to LSI's counsel, "Mr. Rozdilsky did not disclose any of the materials referenced in your letter to anyone other than counsel." J.R. 160. LSI has identified no evidence to the contrary, and upon review of the record, the Court finds no evidence to contradict this statement.

Moreover, Rozdilsky has also provided unrebutted testimony that his sole purpose in taking the photographs was to provide them to his attorney in order to support his claim that LSI violated anti-discrimination laws. LSI does not point to any evidence that Rozdilsky had any other purpose, such as disclosing LSI's information to a competitor or trying to use the information to compete against LSI in the marketplace. On this issue, the only evidence offered by LSI is the content of the documents themselves, which LSI argues are not clearly relevant to Rozdilsky's discrimination claim and could have been copied for some other purpose. A review of the documents, however,

27

reveals that many relate to topics and issues that directly relate to his potential claim, including documents relating to LSI's diversity and ESG activities, to the Al Jazeera incident, and to key individuals such as Anthony Long and Julie Davis. Documents showing Rozdilsky's good performance, including performance evaluations, documents in which he received positive feedback, and those referencing his bonus, as well those showing the performance during the relevant time period of Marketing, which he led, and of LSI overall, would be relevant to such a claim because satisfactory job performance is one of the elements of a *prima facie* case of Title VII discrimination and is often relevant to demonstrate that a claim that poor performance was a legitimate non-discriminatory or non-retaliatory reason for a termination was pretextual. *See Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (listing the elements of a *prima facie* case of employment discrimination under Title VII); *Roberts*, 998 F.3d at 122 (listing the elements of a *prima facie* case of retaliation under Title VII and the associated burden-shifting framework); *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (in relation to a Title VII retaliation claim, accepting an employee's failure to meet performance expectations as a proffered legitimate, non-retaliatory reason for discharging the employee). Indeed, in this case, LSI has made the precise argument that Rozdilsky was terminated based on poor performance rather than discrimination or retaliation.

Although LSI focuses on the litigation reports retained by Rozdilsky, which he testified were copied because he thought that they would be "helpful for a lawyer to see," J.R. 30, those reports included references to employment discrimination cases, including the *Lutz* case, which was a highly analogous case in which Lutz had made substantially similar claims of a termination motivated by race discrimination arising from an intent to increase racial diversity among LSI senior leadership. *See Lutz v. Liquidity Servs., Inc.*, No. PWG-21-1229, 2022 WL 17584348, at

*2 (D. Md. Dec. 12, 2022). Such documents were therefore potentially relevant to a discrimination claim to be advanced by Rozdilsky. Thus, LSI has not identified documents which are unconnected to the asserted purpose of supporting a discrimination claim.

Although some of the copied documents could theoretically be relevant to some purpose other than to support a discrimination claim, LSI has notably identified no alternative purpose for copying and retaining the documents, much less any evidence that would support an inference that any particular document, or the collective set of documents, was copied and retained for that alternative purpose. LSI's reference to Rozdilsky possibly retaining the documents for purposes of "rebutting an assertion that his performance was subpar," LSI Opp'n at 14, 15 n.4, ECF No. 104, does not articulate such a purpose because LSI has provided no evidence upon which to conclude that Rozdilsky, who had just been terminated and thus would no longer be subject to performance evaluations, would ever be subjected to such a claim by LSI, except in the context of the anti-discrimination claim that he expected to advance. In the absence of any evidence of an alternative purpose for copying the documents, the Court concludes that there is no genuine dispute of material fact on whether Rozdilsky is entitled to the DTSA immunity defense. *See Firstenergy Corp. v. Pircio*, 524 F. Supp. 3d 732, 738–39 (N.D. Ohio 2021) (dismissing a DTSA claim where, at the pleading stage, there was no basis to conclude that the defendant "disseminated trade secrets to anyone other than his counsel" or that he "acted for any reason other than whistleblowing").

The case law cited by LSI illustrates the lack of evidence sufficient to establish a genuine issue of material fact on Rozdilsky's purpose. In *Hart v. Digitalzone, Inc.*, No. 23-cv-00531-GPG-SBP, 2025 WL 1927622 (D. Colo. May 30, 2025), cited by LSI, the district court denied summary judgment to both sides on a misappropriation of trade secrets claim against a former Digitalzone employee, Hart, who had downloaded Digitalzone's full customer database shortly before he was

29

terminated. *See Hart*, 2025 WL 1927622, at *6, *18. Although Hart argued that the DTSA immunity provision applied because he had copied the information in order to disclose it to his attorney for the purpose of consulting about wage law violations based on the failure to pay commissions, the court found that there remained a disputed issue of fact where it was unclear why the customer data would be relevant to a wage law claim, and Hart had subsequently started a business similar to that of Digitalzone for which he created a document that contained some contact information also found in the Digitalzone customer database. *See id.* at *6, *17–18 & n.22. While in *Hart* there was some evidence to show that the plaintiff had obtained the trade secret information for a purpose outside the immunity provision, specifically to advance his new business, here, there is no theory or evidence supporting any other purpose for Rozdilsky's actions.

Similarly, in *Thermo Fisher Scientific Inc. v. Arthur*, No. 23-cv-01098-JSD, 2023 WL 8435114 (E.D. Mo. Oct. 17, 2023), cited by LSI, in which a company asserted a misappropriation claim against a former employee who after his termination had downloaded and retained more than one terabyte of Thermo Fisher records that allegedly included confidential and trade secret information, the court granted a preliminary injunction barring the use or disclosure of the information. *See id.* at *1. In so ruling, the court declined to accept the employee's argument that the preliminary injunction was not justified because he had provided some of the documents to federal agencies and thus was protected by the DTSA immunity provision, on the grounds that "only a fraction" of the thousands of documents taken were used or had "any merit" in relation to the alleged violations of law by the company. *Id.* at *1–2. Here, in contrast, there is a full evidentiary record that demonstrates that Rozdilsky did not engage in wholesale downloading of LSI records, that he copied a limited number of pages from the computer assigned to him which

30

have potential relevance to his claims, and there is no evidence of any other purpose or use for his retention of those records.

Thus, where LSI has provided no evidence showing that Rozdilsky retained these documents for some purpose other than to report or investigate a suspected violation of the law, the Court concludes that there is insufficient evidence for a reasonable jury to conclude that Rozdilsky retained the disputed documents in a manner not covered by the DTSA's immunity provision. Because that provision provides that "[a]n individual shall not be held . . . civilly liable under any Federal or State trade secret law," the Court will grant Rozdilsky's Motion for Summary Judgment as to the misappropriation of trade secrets claims under both the DTSA and the MUTSA. 18 U.S.C. § 1833(b)(1).

### B.     Breach of Contract

Rozdilsky also seeks summary judgment on the breach of contract claim in Count 1 of No. 23-1653-TDC, which alleges that Rozdilsky breached the Confidentiality Agreement by photographing, retaining, and disclosing material from his LSI laptop computer. In order for a plaintiff to prevail on a breach of contract claim "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Here, Rozdilsky argues that the Confidentiality Agreement is overly broad and vague such that it is unenforceable, that Section 4.4.2 of the Confidentiality Agreement precludes a determination that his conduct constituted a breach of the contract, and that his retention of confidential information is protected by Title VII's "participation clause," which provides that it is unlawful for an employer to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII, 42 U.S.C. § 2000e-3(a). *See* Rozdilsky Mot. at 30.

31

As to his overbreadth and vagueness argument, Rozdilsky argues that Section 1.1.3 of the Confidentiality Agreement is overbroad and lacks clarity primarily because part of the definition of "Confidential Information" includes "[a]ll information concerning or relating to the way the Company conducts its business which is not generally known to the public." J.R. 102–03. Rozdilsky relies primarily on *Allegis Group, Inc. v. Bero*, 689 F. Supp. 3d 81 (D. Md. 2023), in which the court analyzed whether a confidentiality provision was overbroad because it defined confidential information as "information not generally known by the competitors of COMPANY or the general public concerning COMPANY's Business that COMPANY takes reasonable measures to keep secret" and included a long list such documents and information. *Id.* at 132. The confidentiality provision stated that the "restrictions on use or disclosure of Confidential Information will only apply for two (2) years after the end of EMPLOYEE's employment" when the information "does not qualify as a trade secret," but the restrictions on trade secret information will apply "for as long as the information remains qualified as a trade secret." *Id.* The court found that the provision was overbroad on the grounds that it failed "to clearly define and distinguish the kinds of information encompassed by the terms 'trade secret' and 'Confidential Information,'" such that "an employee lacks 'firm, solid guidance on what he can and cannot do if he leaves his employer,' because it is unclear what information in the clause is a trade secret and what information is subject to use after the two-year restricted period." *Id.* at 133–134 (quoting *SNS One, Inc. v. Hage*, BEL-10-1592, 2011 WL 2746713, at *2 (D. Md. Jul. 11, 2011)). Unlike the confidentiality provision in *Allegis Group*, LSI's Confidentiality Agreement here has no comparable structure creating different obligations for employees depending on whether a protected piece of information is deemed "confidential information" or a "trade secret." As such,

the overbreadth or vagueness issue in *Allegis Group* is not applicable to the Confidentiality Agreement.

Nevertheless, the Court will grant Rozdilsky's Motion as to the breach of contract claim because his retention and disclosure of materials from the LSI laptop computer is protected by Section 4.4.2 of the Confidentiality Agreement, which provides that:

> [N]o provision of this Agreement shall be construed or interpreted to limit, restrict, or preclude either the Company or me from cooperating with any governmental agency in the performance of its investigatory or other lawful duties, including providing documents or other information to a government agency without notice to the Company.

J.R. 108. As discussed above, there is no evidence that Rozdilsky retained or disclosed information from the LSI laptop computer for any reason other than to advance a discrimination or retaliation claim, *see supra* part III.A.3, and he took the first statutorily required step for pursuing such a claim by filing a Charge of Discrimination with the EEOC on October 22, 2021, just two months after his termination, which by law required the EEOC to initiate a governmental investigation into whether LSI had violated Title VII. *See* 42 U.S.C. § 2000e-5(b); 29 C.F.R. § 1601.15(a). Where the terms of the Confidentiality Agreement otherwise barred Rozdilsky from copying the information from the LSI laptop computer that could support such a claim and disclosing such evidence to the EEOC for use in carrying out its statutory duties, those terms necessarily "limit" and "restrict" Rozdilsky's ability to cooperate with the EEOC's activities, including by "providing documents or other information" to that agency. J.R. 108.

The fact that the terms of the Confidentiality Agreement limited and restricted Rozdilsky's ability to cooperate with the EEOC in carrying out its functions is further illustrated by case law in the related context of defining "protected activity" under Title VII, which demonstrates that the conduct at issue—disclosing company information to which Rozdilsky otherwise had access to his attorney or the EEOC for purposes of supporting a charge of discrimination—has been recognized

33

as permissible and helpful to advancing EEOC activities. In *Netter v. Barnes*, 908 F.3d 932 (4th Cir. 2018), the United States Court of Appeals for the Fourth Circuit found that an employee who, in support of her Title VII race and religious discrimination claim, reviewed and disclosed parts of confidential personnel files of other employees to the EEOC and her attorney and then was terminated for doing so had not engaged in protected activity under Title VII because the unauthorized review of such personnel files violated a generally applicable state law that barred the examination and copying of a confidential personnel file without authorized access. *Id.* at 939–40. In so ruling, however, the Fourth Circuit specifically declined to hold that "any *disclosure* of information in violation of an *employer's* confidentiality policy falls beyond the scope of the participation clause." *Id.* 940. Notably, the court recognized "the evidentiary difficulties many plaintiffs face when pressing claims of workplace discrimination," noted that it did not "read the participation clause so narrowly as to improperly limit an employee's ability to gather evidence for a bona fide Title VII claim," *id.* at 939, and concluded that "the underlying act of disclosing evidence to the EEOC and the employer policy violation that such an act may trigger are 'so inextricably related'" that separating the two would "slice things much too thinly" and "threaten[] the full employee cooperation on which Title VII depends," *id.* at 940–41 (quoting *Glover v. S.C. L. Enf't Div.*, 170 F.3d 411, 415 (4th Cir. 1999)). Similarly, in *Kempcke v. Monsanto Co.*, 132 F.3d 442 (8th Cir. 1998), the court found that when an employee found two documents that supported a claim of discrimination on a company computer assigned to him, his disclosure of the documents to his attorney for use in a possible discrimination claim, which then resulted in his termination for not returning all documents found on the computer, was protected activity in the form of opposing unlawful discrimination in part because the plaintiff had "a legitimate interest in preserving evidence of [his employer's] unlawful employment practices" for possible use in a

discrimination claim. *Id.* at 445–46 (quoting *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996)). Thus, while not specifically ruling on the issue presented here, this precedent demonstrates that to the extent that a confidentiality agreement or company policy prevents an employee from gathering and disclosing to the EEOC or an attorney evidence of employment discrimination obtained without violating a generally applicable law, it limits or restricts the employee's ability to cooperate with the EEOC's lawful duties relating to a charge of discrimination.

Here, where Rozdilsky's activities did not involve accessing confidential personnel files of other employees, he accessed only the offline, locally saved contents of the LSI laptop computer assigned to him which he was permitted to possess until the time that he returned the computer, and the evidence does not support the conclusion that Rozdilsky retained and disclosed the information from the computer for any purpose other than the advancement of an employment discrimination claim to be filed in the first instance with the EEOC, the Court finds that Section 4.4.2 precludes a determination that the Confidentiality Agreement bars Rozdilsky's actions because to do so would "limit" and "restrict" his ability to cooperate with the EEOC's activities. J.R. 108. Further, even if Section 4.4.2 were read differently, because the provisions of the Confidentiality Agreement that would bar disclosure of the records to his attorney and the EEOC would hinder and thwart the advancement of a Title VII discrimination claim before the EEOC, those restrictions, as applied to the present facts, would be void as contrary to public policy. *See EEOC v. Astra USA, Inc.* 94 F.3d 738, 744–45 (1st Cir. 1996) (holding that in light of the "significant public interest in encouraging communication with the EEOC," a settlement agreement provision that barred aiding the EEOC in its investigation of a Title VII violation was

void as against public policy).  The Court will therefore grant summary judgment to Rozdilsky on LSI's breach of contract claim.

## IV.    LSI's Motion:  Retaliation Counterclaim (No. 23-1653-TDC)

Finally, in its Motion, LSI argues that it is entitled to summary judgment on Rozdilsky's § 1981 retaliation counterclaim in which he alleges that LSI filed its Complaint in No. 23-1653-TDC in retaliation for his filing of the EEOC Charge and participation as a witness in Lutz's lawsuit against LSI.  "[A] lawsuit filed by an employer against an employee can constitute an act of unlawful retaliation . . . when the lawsuit is filed with a retaliatory motive and lacking a reasonable basis in fact or law."  *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341 (4th Cir. 2008).  Under this standard, "if there is a genuine issue of material fact that turns on the credibility of witnesses or on the proper inferences to be drawn from undisputed facts" then a suit has a reasonable basis in fact, and "if there is any realistic chance that the plaintiff's legal theory might be adopted" then a suit has a reasonable basis in law.  *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 745, 747 (1983). Notably, LSI does not argue that it did not act with a retaliatory motive; rather, it argues that summary judgment is warranted because its suit does not lack a reasonable basis in fact or law.

In *Castillo v. Joann Urquhart, M.D., P.C.*, 855 F. App'x 877 (4th Cir. 2021), after a plaintiff filed a claim for unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), her employer filed a counterclaim for breach of fiduciary duty for performing non-work tasks using the employer's resources, as well as a state court complaint for fraud and invasion of privacy based on the allegation that the plaintiff had forged the employer's signature on an immigration document.  *Id.* at 879.  The court upheld a grant of summary judgment in favor of the employer on the plaintiff's claim that these lawsuits constituted unlawful retaliation under the FLSA because there was a reasonable basis in fact and law underlying those lawsuits, including because the

36

plaintiff had admitted some of the relevant facts, such as that she performed non-work tasks at the office and printed out an immigration document there, even while disputing the details of those allegations. *See id.* The court also found that the employer's counterclaim and lawsuit had a reasonable basis in law where they reasonably alleged the applicable elements and "had a 'realistic chance' of success." *See id.* (quoting *Bill Johnson's Rests.*, 461 U.S. at 747).

Assessing LSI's suit at the time it was filed, the Court finds that Rozdilsky has acknowledged most of the facts underlying the breach of contract and misappropriation of trade secret claims, including that he photographed and retained documents from his LSI laptop computer after he had been terminated and thus was not authorized to do so, and that the materials were covered by the Confidentiality Agreement. He also has not seriously disputed that some of the documents include information that could meet the definition of a trade secret. Thus, there was a reasonable basis in fact and law for the claims, as reflected in the Court's denial of Rozdilsky's Motion to Dismiss in No. 23-1653-TDC. *See* Order at 1, ECF No. 39. Although Rozdilsky argues that, factually and legally, the DTSA immunity provision applies because his use of the materials was limited to submitting the records to his attorney for use in his anti-discrimination claim, that provision is an affirmative defense, and at the time of the filing, LSI was not required to accept Rozdilsky's explanation for his apparent violations of law at face value. *See Unum Grp. v. Loftus*, 220 F. Supp. 3d 143, 147 (D. Mass. 2016) (stating that the DTSA immunity provision is an affirmative defense); *Ramirez Cap. Servs., LLC v. McMahan*, No. 21-cv-00241-ALM, 2021 WL 5907791, at *4 (E.D. Tex. Dec. 14, 2021) (finding that DTSA immunity is "an affirmative defense, and entitlement to the immunity must be established by the defendant"). The fact that the Court has now concluded after the completion of discovery that there is no evidence supporting the conclusion that Rozdilsky had any other purpose in retaining the documents, and

that he is entitled to the affirmative defense on the DTSA and MUTSA claims, does not change the fact that there was a reasonable basis in fact and law as to LSI's claims when they were filed. Because Rozdilsky cannot establish that LSI's suit lacked a reasonable basis in fact or law with no "realistic chance" of success when filed, it cannot constitute an act of unlawful retaliation. *See Castillo*, 855 F. App'x at 879. Accordingly, LSI's Motion will be granted as to Rozdilsky's retaliation counterclaim.

## CONCLUSION

For the foregoing reasons, LSI's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART in that it will be granted as to Rozdilsky's retaliation counterclaim in No. 23-1653-TDC and otherwise denied, and Rozdilsky's Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date: February 20, 2026

THEODORE D. CHUANG
United States District Judge